## PHELPS VS. HENRY & CUNNINGHAM.

The proprietors, having projected a town, laid it off into blocks and lots according to a survey permanently establishing the initial point and designating the blocks and lots by stakes, and caused a map thereof to be recorded, and proceeded to sell the lots. Afterwards, a mistake in the survey being discovered, a resurvey is made, which is generally acquiesced in by the property holders and accepted by the corporate authorities of the town, though not assented to by the purchaser of lot No. 2, the assignee of the original purchaser—who had bought the lot and was put into possession according to the original survey, but after the resurvey accepted a bond for title describing the lot by number—by the resurvey lot No. 1 laps several feet over lot No. 2, the entire depth; and lot No. 2 laps over lot No. 3, &c., HELD, That the lots must conform to the resurvey, and the prior purchasers hold accordingly.

The principle, that quantity shall yield to course and distance in surveys, and that course and distance shall yield to natural objects or artificial monuments, is peculiarly applicable to irregular and large surveys, where quantity is not material: but where land is laid off into compact town lots, quantity is an object of importance, and when it is done according to a regular plan, it is expected that purchasers will buy with reference to it.

Questions in relation to locations in a new country, and in respect of projected towns, which have their first existence on paper, may be regarded differently from disputes between adjacent proprietors in cities, where existing foundations have been fixed by long acquiescence.

The presumption in a Court of Equity, upon a question of limitation between the owners of adjacent town lots, is that they hold according to their deeds, notwithstanding a mistake in the actual division between them, unless after acquiescence for a long period of years, or the possession becomes hostile.

38BB

*Appeal from Crawford Circuit Court in Chancery.*

Hon. B. H. NEELY, Circuit Judge, presiding.

WALKER & GREEN, for the appellant. The proof is that Brown and all who purchased at the auction sales, did buy by the stakes, and with the understanding that their deeds describing the lots according to their numbers vested in them the area included within the boundaries indicated by the stakes: as in the case of the United States surveys, where the boundary lines actually run and marked by the public surveyors, are to be taken and considered as the true boundaries, whether they be right or wrong. *Campbell vs. Clark,* 8 *Missouri Rep.* 553; *Conn aad others vs. Penn* 1 *Peters C. C. Rep.* 496.

The deed to Phelps, and indeed all the deeds describe the lots according to their respective numbers, and their boundaries can be proved even by hearsay evidence, (*Ib*). The mistakes committed by the surveyor, cannot prejudice the purchaser of town lots, when the boundaries are designated by the monuments erected on the lines run; and where town lots have been sold and held according to a survey, possession in respect to boundaries will be respected. *Ralsten et al., vs. Miller et al..* 3 *Rand.* 44, 49.

PIKE & CUMMINS, contra, argued this cause at length, contending that the whole survey was governed by, and started from one fixed point and a front line, neither of which has ever been changed, and must govern in ascertaining the boundaries and lines of all the lots; that in the bond for title to Brown, which stipulated for title in accordance with the plat, there are no calls for course and distance except by reference to the plat, and no calls at all for any stakes or natural boundaries other than the fixed beginning point. The bond calls for the lot as designated on the plat. The intention, which was to run off the town with streets at right angles, must govern, and a mere blunder in the survey

could not be allowed to mar the symmetry of the town, citing *Jackson vs. Wendell*, 5 *Wend.* 146; *Jackson vs. Wilkinson*, 17 *J.R.* 156; *Jackson vs. More*, 6 *Cowen* 706; *Chinoweth vs. Haskel*, 3 *Peters* 96; *Barclay et al. vs. Howell's Lessee*, 6 *Peters* 516 ; *Lodge's Lessee vs. Lee*, 6 *Cranch* 237; *McIver's Lessee vs. Walker*, 4 *Wheat.* 444; *Mann & Toles vs. Pearson*, 2 *J. R.* 40; *Jackson vs. Ogdon*, 7 *J. R.* 238; *Dogan vs. Seekright*, 4 *Hen. & Munf.* 120; *Thomas vs. Patten*, 1 *Shep.* 333.

Mr. Chief Justice WATKINS delivered the opinion of the Court.

Henry and Cunningham, the complainants in the Court below, exhibited their bill in chancery against the appellant Phelps, the mayor and aldermen of the city of Van Buren, Jesse Turner and others, the object of which was to settle boundaries of certain lots in block No. 13, in Van Buren, and to enjoin actions of trespass brought, or threatened to be brought by Phelps against the complainants.

It appears that, in the year 1837, Thompson and Drennen, who are admitted to have been the owners of the land upon which Van Buren is situated, determined to lay off the town of that name, and proceeded to have the site divided into convenient blocks and lots for sale, with intervening streets and alleys for public use. The land bordered on the left bank of the Arkansas river, which there runs in a southeastwardly direction.

The plan projected by the proprietors was rectangular, fronting on the river. They accordingly caused a straight line to be run and established, corresponding with the general direction of the river, and at a convenient distance from it, so as to form what is called Front or Water street; and at an arbitrary point upon that line, they set a stake and established the south east corner of what was to be Main street, to be projected at right angles from the north east line of Water street; and which point became the south west corner of one of the blocks fronting on Main street, next to the river. The line of Water street, so run and established, and the place fixed upon it for the starting point of Main street, have

never been changed, and, as they could at all times be identified and ascertained, are to be regarded as the base of the projected subdivision. The surveyor employed by Thompson & Drennen, then proceeded to run off Main street, and the other streets intended to be parallel with it, and at right angles with the north east line of Water street, and also the cross streets parallel with and at right angles with Main and those streets leading from the river. As the survey progressed, stakes were driven in the ground to mark the corners of the different blocks, and also of each lot, according to the measurement made at the time. Every block was divided by an alley, ten feet in width, and all the lots were intended to be of the uniform size of 33 feet wide by 127 feet deep, and fronting on the streets leading from the river, except those next to the river, which were 125 feet in depth and made to front on Water street. The blocks were numbered in tiers, beginning on Water street, at the south west corner of the site. A plat of the town, thus projected and surveyed, was made, and, on the 21st of October, 1837, filed and recorded in the office of the clerk and ex-officio recorder of Crawford county. It does not appear that any field notes were made at the time the lines of the streets and blocks were run and measured, or any memorial kept of course and distance, or location of the stakes set by the surveyor, nor does it appear, from any memorandum on the plat, what the base of the actual survey was, but the plat as exhibited shows a rectangular survey as before described, with the names, width and dimensions of the streets and alleys, and numbers of the designated blocks and lots, delineated upon it, and the fact is abundantly proved, as admitted by the answer of the defendant, Phelps, that the extension lines were projected in accordance with the plan designed by the proprietors, from the north east line of Water street, and the point fixed upon it for the corner of Main street.

Soon after the survey and map were completed, Thompson & Drennen commenced selling lots by auction, and afterwards at private sale. In most instances, the auctioneer, and the persons accompanying him, moved about from block to block, and cried

the lots, answering t o the description contained in the plat, upon the ground, where the stakes indicating their location were visible to the bidders. On the 28th of June, 1838, the proprietors sold to one R. C. S. Brown, lots No. 1 and 2, in block 13, on the usual terms of sale, which were on credit, they agreeing to make title on the final payment of his note for the purchase money. Lot No. 1 is at the south east corner of block 13, which is in the third tier from Water street, and fronting along the north west line of Main street. The adjoining lots 3 and 4, in the same block, were owned by the defendant Turner. A large portion of the stakes remained standing for several years, after the original survey was made, and when Brown purchased the lots indicated by the numbers on the plat, he went to the place where the stakes were pointed out to him by Drennen, as the corners of the lots in question, and he was put in possession of them. Subsequently, one Hazen became the owner, by transfer, of lot number 1, and at the February term, 1846, of the Crawford Circuit Court, he filed his bill, and at the August term of that year, obtained a decree for title to it against Drennen and the representatives of Thompson, who had deceased, and at the August term, 1848, it was sold under execution against Hazen, and purchased by Henry & Cunningham. On the 20th of June, 1841, Drennen, the survivor of Thompson, executed his bond for title to Brown, for lot No. 2, reciting and confirming the previous sale of it to him, and conditioned to make title on the receipt of the purchase money. In this bond for title, accepted by Brown, the lot is no otherwise described than as "a parcel of land situate in the town of Van Buren, &c., and known, according to the plat of said town, duly filed for record &c., as the lot No. 2, in block No. 13, fronting on Main street 33 feet." On the same day, Brown sold his interest in the lot, and assigned the title bond to the defendant, Phelps, who soon after built a house upon it, and at the February term, 1846, filed his bill, and at February term, 1848, obtained a decree for title predicated upon the bond of Drennen and the description of the lot contained in it.

In the year, 1842, it was discovered that the original survey was erroneous, that is to say, it did not correspond in its actual lines and distances, as run and measured, with the plan projected by the proprietors, or the plat filed in the recorder's office; owing to carelessness, it may be supposed, of the surveyor, there was a slight deviation in some of the lines from a right angle. But the more important fact is, that the measurement going north eastwardly from Water street, was inaccurate; whether because it was surface instead of horizontal, or because of a defect in the chain or line used, does not appear. The result of the measurement falling short, would be to derange the plan of the town, and diminish the size of some of the lots, unless the streets were infringed upon for quantity. In the same year, Drennen, in conjunction with the administrators of Thompson, the defendant Turner being one of them, caused a resurvey to be made, and a plat of it, with some additions to the town, was filed in the recorder's office. This survey, by which several permanent monuments of Stone were erected, is admitted to be accurate, according to the plan originally projected, and assumes the first line of Water street and the starting point of Main street, to be the base of the extensions. The change made by it affecting these parties is, that the location of lot 1, ascertained by exact measurement, was found to be about four feet further from the river, than it was before understood to be, and it laps over that much along the entire length of lot 2, in order to have its complement of front on Main street. In like manner, lot 2 laps over four feet on the adjoining lot 3, owned by the defendant Turner. Phelps never gave his consent, in any form, to the new survey, but, so far as shown, it was acquiesced in by the property-holders generally, and recognized by the mayor and aldermen, who required the buildings thereafter erected and the laying down of pavements, to be in conformity with it. And the recognition of the corporate authorities is to be inferred from the acceptance of the charter granted by the General Assembly, on the 24th of December, 1842, to incorporate the town of Van Buren, so far as it contemplated that

an authentic survey should be made and recorded under their direction, or adopted by them, if already done, and of the subsequent act of January 4th, 1845, incorporating Van Buren as a city, with reference to the limits fixed by the town authorities, and the survey and plat recorded in 1842. The houses built in Van Buren, previous to that time, were intended to conform to the original survey, and in some instances would be partially interfered with by the resurvey. Altogether, they exceed in number those erected after that time, but were mostly built of wood, and not so permanent or valuable as the recent structures.

In the year 1849, Henry & Cunningham built a brick store house covering the entire surface of their lot No. 1; and conforming to the resurvey, it occupies a strip four feet wide, and the length of the adjoining lot 2, claimed by Phelps, in virtue of his purchase, according to the original survey, and to which by his answer he asserted title, in opposition to that of the complainants. Decrees *pro confesso* were taken against all the other defendants, and, at the final hearing, the Court below decreed in favor of the complainants, confirming the boundaries of all the parties according to the resurvey, and giving to Phelps the full front and depth of lot No. 2, by requiring Turner, the owner of lot No. 3, to remove the house adjoining that of Phelps, and which obtruded four feet upon his lot as fixed by the decree.

The opinion of the Court, upon the case stated, is that the decree appealed from is just and equitable, and ought to be affirmed. In coming to this conclusion, we are not unmindful of the correctness of the general proposition contended for, on behalf of the appellant; that where an actual survey has been made, calling for natural objects, marked trees, or any artificial monuments, the objects described will govern, in ascertaining the boundaries of the tract conveyed according to the descriptive calls in the survey, in preference to given courses and distances, in which, from various accidental causes, errors may have occurred; and so again, that quantity, the least important matter of description in a deed, and seldom essential for any purpose, unless it can be construed

into a warranty of the extent of area sold, yields to course and distance, where either cannot be made to correspond with another. But that principle is peculiarly applicable to irregular surveys, usually on a large scale, where natural objects or established corners become more important than course or distance, and exactness of quantity is immaterial, compared with the repose and quiet of a country. It must be admitted that if Thompson & Drennen had sold to the appellant, or to Brown,, the original purchaser, whose right he acquired, any isolated portion of their tract, and caused it to be surveyed off to him, and marked by monuments even as perishable as the stakes here used, the actual location on the ground would control in a conflict between that and any other subsequent survey. But where a tract of land is laid off into compact town lots, it is obvious that the quantity stipulated for becomes an object of importance, and where it is done according to some well understood and regular plan, it is to be expected that purchasers will buy with reference to it. No one ought to have exclusive rights in preference to others. The public have an interest in the easement afforded by the streets, alleys, or landings, and ordinarily the corporate authorities are charged with the duty of preventing their symmetry and regularity from being marred, or the use of them obstructed by unsightly projections. Questions of this kind in a new country, and in respect of projected towns, which have their first existence on paper, may be regarded differently from disputes arising between adjacent proprietors in cities, where existing foundations have been fixed by long acquiescence, and where it may be assumed that the location of any one street or corner is as correct as another. There if streets are to be widened, or obstructions removed, it is done upon some equitable principle of compensation by the public at large, or those more immediately benefited, to the person, who is to be deprived of his property. But the purchaser of lots in a new town, designed to be built up according to a regular plan, open to his inspection, must have some concern in assuring himself, before he builds a house, of the correctness of its loca-

tion. Errors may occur from carelessness, or inattention, without any fraud or intentional wrong being imputable to any one, and nothing of that kind is alleged here. The appellant insists that Brown, the original purchaser of both lots, bought by the stakes; but it cannot be doubted that he bought the lots indicated by the numbers and description on the plat shown him and with reference to a consistent whole, as well as by inspection of the stakes, which he supposed, and were intended to mark the boundaries of the lots in question. If so far deceived as to lessen materially the value of his purchase, he might have recourse upon the vendors for damages, or obtain a rescission of the contract, or he might have a just claim for compensation, upon the corporate authorities, if his improvements had been improperly located by their direction. But conceding that such was the understanding of Brown, at the time of his purchase, the contract between him and the original proprietors became merged in the bond for title, which he subsequently accepted from them, and the rights of the appellant, as assignee of Brown, depend upon the terms of the bond, and the decree for title which he obtained in fulfillment of it. That called for a particular lot of a certain extent and front, as designated upon the recorded plat. Where a map is projected from the field notes of a survey, of which it is a representation, a sale by the map is a sale according to actual survey, on the supposition that the courses, distances and objects called for, are correctly delineated upon it. But, in this instance, the plan preceded the survey, and the map was a representation of the plan instead of the survey, of which no memorial was preserved, except the planting of corner stakes; and in the event of their removal or decay, the survey so called could not be retraced, but might be renewed, in conformity with the original plan, by starting from the initial line established on Water street. When the government of the United States adopted the system of square surveys, dependent upon arbitrary base lines, and in which a regular consistent plan precedes the survey, it was deemed advisable to provide against discrepancies between the practical result

39BB

and the theory, by the enactment of February 11th, 1805, to the effect, that the lines and corners actually run and marked, the courses, distances and areas returned, should be held and remain as permanent and true, without regard to mistakes and errors, which may afterwards appear to have been committed by the surveyors, in endeavoring to conform to the general plan.

The question of limitation argued by the counsel for the appellees, does not seem to be relied upon by the appellant. The bill was filed in April, 1850, and no contest about the right to the possession of the strip of four feet in controversy, arose until 1849, when Henry & Cunningham built their store house upon it. Admitting that Phelps was in peaceable possession of lot 2, since June, 1841, and under a claim of title, the statute of limitations then in force would not avail him, even if it applied to a case of this kind. The presumption in a Court of Equity would be, that he and the owners of adjacent lots held according to their deeds, notwithstanding a mistake in the actual division between them. An acquiescence, for a long period of years, in such a division, would raise a presumption that it had been originally agreed upon, and so ought not to be disturbed. But where the possession of land is held without title or claim of right, and only in ignorance of the true boundary, the intruder will be entitled to the protection of an adverse holding, computing it from the time when his possession became hostile by some unequivocal act, such as a refusal to move. Affirmed.