GARRETT v. MUSGRAVE.

4-8935                                          223 S. W. 2d 779

Opinion delivered October 24, 1949.

*Abe Collins* and *J. F. Quillin,* for appellant.

*Shaw & Spencer,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal results from a disagreement between adjoining landowners re-garding the use of a well, but in determining relative rights the Chancellor established a true line. Effect was to quiet title in appellees to a strip thirteen feet wide on the west side of Lot 10, and to create in the disputants a common tenancy in respect of the well as such.[1]

Prior to 1944 J. P. and Hazel Turner owned Lot 10. By deed of August 28th of that year they conveyed to Harold Sandlin the west thirteen feet. A description note of explanation was: "This thirteen-ft. [strip] is supposed to run a line in the center of the well now located on Lot No. 10." The deed was filed for record December 7.

By deed of December 7, 1944, the Turners sold to Robert and Lucy Wilkinson "Lots 10, 11, and 12," of Block 7. This deed was recorded December 15th.

On March 13, 1945, the Sandlins delivered to Beuna Garrett their deed conveying ". . . the west thirteen feet of Lot 10." Following the description, within parentheses, this notation appears: "The thirteen-ft. [strip] is supposed to run in a line in the center of the well now located on said Lot 10."

It will be seen that when Turner sold to Sandlin, and when Sandlin sold to appellant, the center of the well was thought to be the boundary. Emphasizing this supposition, Robert and Lucy Wilkinson sold to appellees only thirty-seven feet of Lot 10 when on November 17th they transferred Lots 11 and 12 to her.

Litigation began in December, 1948, when Mrs. Garrett procured from Polk County Court an injunction restraining the Musgraves from using the well.[2] The de-

---

[1] The true description is Lot 10, Block 7, of the Original Town of Hatfield, Arkansas.

[2] Constitution, art. 7, § 37; 3 Ark. Stats. (1947), §§ 22-435, 32-104.

fendants there were also directed to remove copper piping that had been installed in connection with the proposed mechanical pumping. In dissolving the injunction and awarding to appellant that part of Lot 10 "from the center of the well west," and to appellees "that part from the well's center east," each was given the right of use without interference from the other. There was an express finding that the installation had in no sense contaminated the water, and that its use would not interfere with appellant's requirements.

The Chancellor was warranted in finding that appellant knew of the deed presumptions or suppositions when she acquired the thirteen-ft. strip. Effect of Mrs. Garrett's testimony relating to the rights of others is that, after the deed had been prepared and a check in payment written, but before it was cashed, she ascertained the material facts. In her testimony Mrs. Garrett said, "I had paid over the money [before the information was received"], but she immediately added, "I had written the check." Sandlin, she explained, told her the well was being jointly used. This mutuality continued until appellees undertook to install the pump.

There was testimony that the well had been in use for approximately forty years, and without exception adjoining proprietors had drawn water under a claim of right, each conceding to the other a like privilege.

One of the appellees testified that when ditch-digging was under way preparatory to putting in the pump, Mrs. Garrett objected, but readily agreed that the dividing line was "through the well." This, she said, was reflected by the deed.

For the purpose of determining how long the well, as an established boundary monument, had been looked to, the Court permitted Sandlin to testify that he had owned the Garrett place, and that Turner had owned the Musgrave property. Turner, said Sandlin was going to sell, ". . . so I propositioned him about buying

half of the well. There had been a partition fence between the places".[3]

An early discussion of the extent to which descriptions by metes and bounds will be considered when in conflict with natural monuments or landmarks, is to be found in the opinion of Chief Justice Watkins, *Phelps v. Henry & Cunningham,* 15 Ark. 297. The principle he expressed, and one generally accepted, is that quantity must yield to course and distance in surveys, and that course and distance shall yield to natural objects or artificial monuments where quantity is not material; but where land is laid off into compact town lots, then quantity is an object of prime importance, and when the survey is according to a regular plan, it is expected that purchasers will buy with reference to it. See *Cooper v. Woods,* 194 Ark. 1155, 110 S. W. 2d 701; *Davis v. Strong,* 208 Ark. 254, 186 S. W. 2d 776.

The controlling consideration is that if buyer and seller, who are familiar with real property, deal with reference to particular things and places they have seen, it must be presumed that these natural objects were of paramount importance, otherwise they would not have contracted with reference to them.

Although in the case at bar town lots and parts are involved, the testimony of all of the interested witnesses shows that the well was an essential. It was the principal objective to which all turned, hence the conclusion is inescapable that no one had in mind the value of a few feet of land other than as a means of reaching the well.

Affirmed.

---

[3] Further testimony by Sandlin in regard to the line was: "When Turner and I got out there we found a 'place' as close as we could to what we thought was the old fence between the two places. We 'took off' thirteen feet, and that was supposed to be the old line between— the center of the well. I put up a corner post. I believe Mrs. Garrett has a hedge that grows up to the well. In other words, the fence comes right to the center of the well. When I sold [Mrs. Garrett] the place Clyde Farmer came down and asked what I wanted for it, and I told him what I would take. When I went out to the car to go home, *they* said they would buy, and I told them that afternoon that half of the well belonged to her. I bought the extra strip. I first had a lot and a half, then I bought that to get the well."